May it please the Court, good morning. My name is Richard Lowe. I represent the Dong Shu Kong and Nina Chen, the appellants in this matter. Your Honors, this is an asylum case with a similar to the previous one, an adverse credibility finding. I think there are really two specific issues before the Court today, and that is credibility, the applicants, and the corroborating evidence in the underlying case. And permeating those two issues is, I believe, the misconduct of the immigration judge during the proceedings, his predisposition and bias. And underlying all of those is perhaps a question about the REAL ID Act and its application in this matter. I'll take the foundational question about the REAL ID Act first. I believe that as far as the credibility and corroborating evidence concerns under Section 208b1b, it's pretty clear that the effective date of that is May 11th, 2005. And as for the standard of review in this case, Government counsel has alluded to the fact that that would apply to any final orders issued before, on, or after such date of effective date. However, the section in which that is, which is Section E, states that no court shall reverse a determination made by a prior fact with respect to the availability of corroborating evidence, as described in Section 208b1b. And I believe that this prior fact, the immigration judge, did not, in fact, make a determination under Section 208b1b. So the law as it existed at the time of the hearing, which is 1999, is the, what I believe is the law that should be in effect. As for the credibility and the corroboration, the I.J. made several points in his oral decision, seven points, I believe, none of which really go to the heart of the matter, and that is that Mr. Kong was active in an underground church. He was a Christian. He was arrested. He was detained for several days. He was beaten. He was prodded with an electric prod. He sustained severe bruises on his back and on his legs. And he eventually had to flee China. The judge found, and I believe this bleeds in with the last part of the immigration judge's predisposition. In his oral decision, the judge makes the case that looming large in this case is the suggestion that respondents are economic refugees. That suggestion came only from the immigration judge, not from any evidence that was submitted in the record, not from any testimony that was taken from the respondents. That was the immigration judge's predisposition to find educated, employed people cannot be refugees, that they can only be economic refugees. Well, he didn't quite say that. He just said that he thought that these particular people were economic refugees. Right. And the only basis for that was the fact that they had passports and were able to leave China and that they had jobs in China. The inference there is if you are an educated, well-connected person in China, you're not going to be persecuted by the Chinese government. And I don't believe that that bears out at all. The other inconsistencies, which the immigration judge pointed out, as I explained in my brief, were all explained. And they don't go to the heart of the matter, really. There's no discussion about whether or not he, in fact, was beaten or not, whether or not he, in fact, attended the church or not. The trial attorney's cross-examination was scant at best in those issues. And for that matter, I believe that the immigration judge did his own cross-examination of the witnesses, something that which I believe is entirely improper, and particularly in Appellant's Nina Chen's testimony, where the immigration judge spent a considerable amount of time cross-examining Ms. Chen on her passport, on how she obtained the passport, how she obtained the exit stamps, using the country report as a way to rebut her specific evidence of what had happened to her as far as getting passports. Let me ask you this. Mr. — I'm not sure I'm pronouncing it right — the lawyer for the government, Varzandeh. Yes. I'm at AR-113. You don't really need to turn to it. You might want to. It says — this is now after the testimony is basically closed — the service believes that although the story was fairly internally consistent, it's not consistent with the profile of asylum claims and country conditions. That is to say, I view that as close to a concession that the story is not internally consistent and that the service is relying on the country report. Now, could you respond not to the inconsistencies that the IJ found, but rather to the contention that the country report is inconsistent with the story that was told? I think it's completely disregarding the country reports that are issued from China. Obviously, religious persecution is rampant in China. It's clear from the evidence that was presented at that time. And there were some issues that were brought up in the country report itself, which I believe is at best ambiguous as to what is — what was going on. The suggestion that church — underground churches were allowed to exist, that communist members were allowed to practice religion. I think all of those are speculative. And on the point of the country report, I think there are more specific evidence to the fact that, in fact, underground churches are persecuted. It is something that goes on regularly in China, and it is something that this Court has on numerous occasions found to be true. So if the testimony itself is fairly consistent, internally consistent, then I believe the I think it's in the record, but I confess I don't know the answer to this. I'm reading from AR 224. It's part of the country report. There's — the very last paragraph on that page. The country report says, there's evidence that authorities increasingly have used short-term detentions rather than long-prison terms when dealing with unauthorized religious activities. They've used threats, demolition of unregistered property, da-da-da. And then, the unofficial religious groups have been hard hit. In Beijing, the provinces of Hainan, Anhui, Shanxi, Xinjiang, Annanmen, and Hebei. Where was this? That is to say, where were the petitioner and his wife when this happened? Do they — are they in any of these provinces that are listed on the line — up from the five and four lines up from the bottom, AR 224? Your Honor, I cannot say for certain that I know where they are. But I think that — Or rather, where — yeah, yeah. Where they were, yes, Your Honor. I don't know for certain that they came from one of those provinces. But I think what that sentence is saying is that the unofficial religious groups — and that is underground churches. Sure. The official groups are the ones that are sponsored by the Communist Party, the Communist churches that are sponsored by the Communist Party. He was not a member of one of those churches, although he did attend for a couple of meetings. But it was the underground churches — and that is clear, worn out by the country report, that underground churches are being persecuted in those provinces. Okay. Yeah. But you don't know what province they were in? I do not specifically know what province that he was — that they were in. I don't either. Maybe it's on the record, but I confess I simply don't know. Okay. Going back to the — the IJ's predisposition, I think it's clear from — that he was looking very — looking for inconsistencies where none really existed. For example, his date of release, the immigration judge makes a lot of hay out of this April 12th release date. However, on two separate occasions, the respondent did, in fact, say he was released April 17th on direct. And then, again, on cross-examination. And both of those are consistent with his written statement. And I believe his statements were consistent and credible and should be taken as enough to show that he was, in fact, persecuted for his religious beliefs. Thank you. Do you want to reserve? Yes, I'd like to reserve two minutes. Thank you. Good morning. My name is Jacob Bachelor. I'm here on behalf of the United States May it please the Court. I would like to start — How long have you had the case? I beg your pardon? How long have you had the case? A month. A month. And you have the record with you? Yes, I do. That's what we want to know. What do you think is the principal incredible statement on the part of the petitioner? I think that the immigration judge found at least seven of them. I think — Oh, I'm asking you. What do you think is the most incredible — The most incredible statement as to how they obtained visas to enter the United States. I think that seems to me as incredible that they didn't go and — at no point it shows that they went to see the consul to obtain those visas. And it seems very unlikely that the United States would issue visas, I mean, especially the first-time travelers from China, you know, the first time they apply for them. So it seems to me incredible. Well, how do you think they got them? I beg your pardon? How do you think they got them? Well, as the immigration judge pointed out, they're either that Mr. Kang's — he worked at — by the way, I'd like to answer the question as to where the petitions were from on his asylum application, which is — let me direct your attention to page 290 of the record. He's from Liaolang province, if I pronounce it correctly. Mr. Kang works for — used to work for Petroleum Chemical Fiber Corporation. So one of the things that the immigration judge suggested, it might be his job — he alluded to that. It might be his job that helped him to obtain those visas. But he's just guessing, and of course, we're all guessing. I mean, they could have bribed them. They gave the explanation. The people in the church group worked it out. We don't know how a totalitarian society that is also corrupt works. Well, you don't know, I don't know, and the IJ didn't know. Well, in fact, Your Honor, I do know, because I was born in former Soviet Union. So I — I was born in former Soviet Union, so I do know how corrupt societies and totalitarian regimes work. So I would say that it is highly unlikely that the United States would issue fraudulent visas to — I mean, to these individuals. It seems very unlikely. I mean, as far as totalitarian societies, and besides being oppressed, people are taught how to lie, and consistently lie, because they need to survive. And these statements that petitioners made in immigration court under oath, and their asylum applications, seem to be incredibly inconsistent. Because besides being oppressed, and in — for whatever reason, people come to the United States to obtain socioeconomic benefits. And what were you saying is incredibly inconsistent? Incredibly — well, it was incredibly inconsistent. Are they — as the IJ pointed out, seven — there are seven — at least seven inconsistencies. Yeah, but we have to go through it one by one. That's why I thought you — We can start — The first one you give is something you don't believe, because you think it's implausible. It's not inconsistent. It's just implausible. Where's the biggest inconsistency? Another inconsistency I would like to direct your attention to is when he stated that it was his unit supervisor who criticized him about being a member of the church. But then, in another place, he stated it was a party official, party secretary. And then, at no point in his written statements, he says there was a written confession that he had to write. This is inconsistent. This is a very important detail. If somebody forces you to do something like that and traumatizes you like that, that has to be on the record. You have to state it. You have to point out to that in order to obtain — That's not an incident of persecution. I beg your pardon, Your Honor? I said that does not go to the heart of his persecution claim. And as far as the heart of the claim, he claims that he was assaulted by the police. He was detained by the police. He was allegedly tortured. He was beaten on — I think it was by three police officers, if I remember it correctly. And then, he comes back home, and his wife — who is a physician? She's a physician. I mean, as far as pointing out, I mean, there's a question as to whether she's a doctor or not, because her passport states that she's a manager, which is kind of also inconsistent as to who she is. We don't know who she is. There is no proof. She didn't submit any corroborating evidence to show that she was a physician. But it's besides the point. So he comes back home, and his wife, who is a physician, does not really — you know, there's nothing to suggest that she examined him. She didn't take him to the hospital and, you know, ask for X-rays, MRIs. I mean, if somebody is being detained — But could I call your attention to the record at 169, if you look at it? Yes, Your Honor. I got a ration judge. Ma'am, did you take your husband to the hospital to get an X-ray? Answered, because I'm a doctor. I have all the knowledge and stuff at home to know whether he had bruises, any broken bones or not. And what I saw, they were all bruises from the beating. Nothing was broken. Well, she doesn't have an X-ray machine at home. What's that? She doesn't have an X-ray machine at home. How does — Well, she makes that judgment. Physicians do make judgments. But as to the — I mean, that contradicts what you told us. As to the extent of the injury — It contradicts what you stood here and told us, I believe. It's not — Your Honor, I don't think it contradicts what I told you. I think what I was referring to is that when he was injured, allegedly injured by the police, he claims in his — No, but you talked about what his wife did. And his wife examined him. You said she didn't examine him, I think. What I said is that there was — What I was referring to that she — She stated here in the record, and I want to clarify as to what I said. She stated here is that she was the physician. She had all the knowledge. And she — When he came back home, she was able to figure out as to whether there were any bones broken, et cetera, et cetera. But it doesn't say here that she examined him. Where does it say that she examined him? Oh, goodness sake. She says she looked at him? She looked at him? She saw that there were bruises. She determined from looking at him that no bones were broken. Now, that sounds like an examination to me. Well, I respectfully disagree. I — Now, you may have a notion of an examination that has to be done in a doctor's office, but I think we're now just quibbling over whether she looked at him or whether she examined him. She clearly looked at him, and she made a determination according to what she says. She told the immigration judge, and that's what the immigration judge pointed to, is that first there was a claim of severe injuries. And that's what I would like the Court to vote. Well, if you have marks all over your body, that's pretty severe. I wouldn't want it. Would you? Your Honor, but he claimed that he had his face slammed against the wall. There is nothing here to suggest that she even doesn't talk about that. And then she says, well, they're just bruises on his legs. I mean — She says all over the body. But the immigration judge, that's what I'm talking about. The immigration judge does not know what to believe. He doesn't know what to believe. If there was a consistent — Your Honor, you know, if you're listening to testimony carefully, and you get an answer, and two minutes later get an enlargement of the answer, that's not inconsistent. The details are coming out. That's the way testimony comes out. It doesn't all come out in one gulp. But what I would like to point out is that I agree with what you said. I think that, of course, when you have a direct, you have a cross, you have a redirect, you were given an opportunity to reconcile those inconsistent statements. You were being asked about specific details in light of your statements. When you being asked specifically as to what you wrote, and now you say something that contradicts what you wrote, this is inconsistent. I mean, no matter how you look at it. Can I interrupt for just a minute? Yes. Because the time is running. I'd like to make a — I want to read you a passage from AR-169, and then I'd like to make a sort of lawyering suggestion. We've now had you here. I think this is the third case this week. You're a conscientious lawyer, and you're trying to do your best, but I want to give you a lawyering suggestion. Yes. Okay. First, I want to read earlier on AR-89. This is her testimony. When I went to pick him up, I noticed that he had lost weight. There was something wrong with his face, as if it was black and a scab on his face, and his face had lost weight. So I asked him, Have you been beaten? Well, scab on his face suggests that, consistent with his testimony, he's had his face or his head pushed into the wall. Okay. Now, you've said today, as you've said the other day, as a kind of a formula, there's nothing to suggest, da-da-da-da-da, when, in fact, repeatedly in the record, there is a lot to suggest that so-and-so is true. So you said there's nothing to suggest that, in fact, he's had his face pushed into the wall. Well, this is far more than to suggest. This pretty clearly indicates that it's support for his own testimony. Now, the lawyering advice I would give you is, you're quite familiar with the case. You're quite familiar with the record. But slow down. Be careful with your statements. Have everything you say be consistent with the record, because you're going too fast. You're saying nothing to suggest X or Y or Z. And repeatedly over the last several days, there's plenty to suggest exactly what you're denying. I'd like to add to that. As an old teacher of professional responsibility, which was my main subject at both, I have taken a special interest in the professional responsibilities of lawyers to be completely candid with the court. And I want to tell you, we're going to look at what you've said and see whether you have been. Your Honor, I'm being candid with the court. I'm not hiding anything. What I was trying to say, I was arguing as to what the I.J. pointed out. In fact, when I said that as to the record, what it says is that there's contradictory statements. It's argumentative. I wasn't there. I didn't say that. The only thing I rely on is the record. If at no point I would like the court, this Court, to believe that, I think that the record that was presented and as to what I said, I rely on the statements of the I.J., on the brief, and on the record. And in my own honest opinion, it's the last thing that I would like this Court to believe that. I want you to see only one side. I don't think anybody suggests that you lie, but, you know, there is a duty of candor, that's all. I'm being candid, Your Honor. I'm honestly looking at the record and seeing what I see as to what the I.J. pointed out. I mean, the I.J. is also, I mean, it appears that the I.J. pointed out that there are inconsistent statements. Now, you're running over time, and I intend this as entirely as a friendly suggestion, slow down and be careful. Yes. Okay. Thank you. Once again, I appreciate your advice. Okay. And I did not mean and I don't want it to be taken that at no point, I understand it's an adversarial system, but I was passionately arguing the case. Yeah, yeah. Okay. Thank you. I just understood the argument to be trying to point out inconsistencies in the record in aid of the argument that the record doesn't compel a conclusion of credibility. So that's my take on it. Thank you, Your Honor. And I would like to say the form of your argument seems to me perfectly appropriate, and I'm only after you on the suggestion just as a matter of technique that you'll be more persuasive if you're more precise. Thank you, Your Honor. Okay. I really appreciate this advice. Okay. Okay. Thank you very much. Okay. Thank you. Response? Thank you, Your Honors. I'd just like to address the few points that the attorney for the government addressed. As to the province, it's not the province, it's the city that's in the application, so I don't know where that city is located. As far as the passports are concerned, the witnesses were specific about how they got money, how they gave the money to people, how those then were obtained, the passports were later obtained. And even the government counsel admits that although it's very unlikely, the possibility still remains that that is possible, and that is something that should be given to the appellants here who were witnesses and who were credible in their testimony. Second of all, as for the injuries, I think it was clear, as Your Honors pointed out, that she did notice his face was bruised. But more importantly, I think the immigration judge made an issue of the fact that she seemed to change going from the back was bruised and the legs were bruised to now only the legs were bruised. That is, in fact, not at all, she says, because all his bruises and marks were on the back and his legs. I don't know that the IJ perhaps read that as meaning the back of his legs, but it is the back and legs inconsistent with what she had said before. She's a medical doctor. He had just been released from prison, a state prison. Taking him to a state hospital, I think, would be a little bit ridiculous at that point, given that she has the medical knowledge to determine whether or not he has any serious injuries. Serious injuries could be then treated later on at a later time. And thank you, Your Honor. Roberts. Thank both sides for their argument. And, Mr. Grashoff, I look forward to your next argument in front of us. Okay. Thank you. The case of Congress v. Casey is now submitted for decision. Thank you. The next case on the argument calendar is United States v. Salem.
judges: Noonan, Fletcher, Gould